IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THERESA S. MUBANG

v.

UNITED STATES OF AMERICA

:
:
: Civil Action No. DKC 06-1838
  Criminal Case No. DKC 03-0539
:
:

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this involuntary servitude case is the motion of Petitioner Theresa Mubang to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255 (ECF No. 95), along with several related motions (ECF Nos. 96, 99, 107, 108, 110, 113, 114, 117, 118). The issues are briefed and the court now rules. For the reasons that follow, Mubang's three motions to supplement the record will be granted, her motion to submit unpublished authorities will be granted, and her motion to submit corrected filings will be granted. All other pending motions, including the motions for relief under Section 2255, will be denied.

**I.   Background**

**A.   Factual Background**

This case stems from Petitioner Theresa Mubang's treatment of a young illegal alien from Cameroon named Evelyn Chumbow. Mubang brought Chumbow to the United States, ostensibly to

receive an education.  Rather than sending Chumbow to school, however, Mubang instead held Chumbow in servitude for more than two years, forcing her to cook, clean, and care for Mubang's children without compensation.  At the same time, Mubang isolated Chumbow from the outside world while subjecting her to substantial physical and mental abuse.  Mubang's treatment of Chumbow was apparently part of a pattern of conduct spanning several years and involving multiple girls from Cameroon.

Various witnesses at trial provided testimony establishing the oppressive coercion that Mubang used to keep Chumbow working in her employ, but perhaps the most powerful testimony came from Chumbow herself.  Chumbow told the jury how Mubang forced her to work from the early morning hours until very late at night, maintaining the household, cooking, and taking care of Mubang's children.[1]  When she was allowed to sleep, she slept on the floor.

---

[1] At least three witnesses, Gladys Gwanaji, Peter Ndikum, and Vivian Massa, confirmed the incredible work demands Mubang placed on Chumbow.  Gwanaji, who stayed in Mubang's home for a few months, described how Chumbow would wake up at 5:00 am (or earlier), scrub and clean the bathrooms, heat up milk for Mubang's baby, make Mubang coffee, mop the floor on her hands and knees, cook breakfast, scrub the carpet, dust, vacuum, and make the beds.  Meanwhile, she was charged with taking care of two children and sometimes a neighbor's additional child.  She did all this even though she was only ten to twelve years old at the relevant time.  Ndikum, who worked at a business Mubang ran out of her home, also witnessed Chumbow doing chores and taking

According to Chumbow, when she did not complete her assigned tasks to Mubang's satisfaction, the consequences were severe:  Mubang would beat her with the heel of a shoe, pull her hair, and punish her with other physical abuse on roughly a weekly basis.  Other times, Mubang would use a length of white plastic television cable to whip Chumbow's hands and back until she bled.  Chumbow received one beating with the cable, for instance, when she changed the television channel while Mubang's child was watching it.  On some occasions, Mubang would use a metal broom, striking Chumbow with it over and over until she grew exhausted.  Yet another time, Mubang beat Chumbow so much she bled on Mubang's carpet; Mubang angrily instructed Chumbow to "clean [her] stinking blood on [her] carpet."  When Chumbow did not clean up the blood well enough, Mubang beat her again. The Government showed pictures of the resulting scars at trial, and Chumbow testified about some head wounds.  Still, some abuse left no mark.  When Mubang was too tired to beat Chumbow, for example, she made her stand next to Mubang's bed throughout the night – without support – as an exhausting punishment.

---

care of Mubang's children all day.  Massa, who was brought into the home partly to help train Chumbow in her household duties, saw Chumbow work long hours as well.

Chantal Adembuh, Chumbow's cousin and another girl who was sent from Cameroon to live with Mubang, corroborated many of the acts described by Chumbow. Adembuh watched as Chumbow cooked, cleaned, vacuumed, and took care of the children, all without receiving payment, schooling, or clothing. She saw how Chumbow acted afraid around Mubang, and how Mubang would yell at Chumbow when the "chores" were not done correctly.[2] Sometimes, she also saw the physical abuse: she witnessed as Mubang beat Chumbow with the white cable, saw Mubang pull Chumbow's ears, and watched as Mubang would slap Chumbow in the face. Adembuh, who had known Chumbow in Cameroon, also noticed the new scars that had appeared on Chumbow's body since her arrival in the United States.[3]

Other testimony provided further support for the claims of abuse lodged against Mubang. Vivian Massa, for instance, testified that she saw Mubang strike Chumbow when she did not do her work well. In one such instance, Massa watched as Mubang

---

[2]  Another witness, Scholestica Monikeng, saw Mubang angrily rebuke Chumbow for handling one of Mubang's candles.

[3]  Chantal's testimony suggested that Mubang threatened Chumbow's immigration status. Mubang purportedly told Chumbow, "[I]f not of me, you will not be in America." Mubang actually did send one girl who worked in her home before Chumbow back to Cameroon, after authorities forced Mubang to send her to school.

dragged Chumbow into another room, where she proceeded to beat Chumbow with a shoe.

The jury also heard testimony from Emelda Angu. In December 1998, Chumbow and Adembuh decided to run away from Mubang's home. They contacted Angu, a relative of Chumbow, who testified that she picked them up from Mubang's residence and took them to her house to stay with her. Angu stated that, at the time she picked the two girls up, she noticed that Chumbow had an oozing head wound and some other scars. Angu soon learned where the wounds came from, as Chumbow began telling her stories of her abuse at Mubang's hands. Mubang told Angu how Mubang beat her with the heel of a shoe for under-seasoning the food she cooked. Angu learned how Mubang would pull Chumbow's hair so hard that she would yank clumps of hair from Chumbow's head. And she heard how Chumbow received beatings with a cable or a broom. Angu testified about those statements at trial.

Mubang offered her own witnesses who did not see her strike Chumbow or see any physical injuries. Witnesses such as Dr. John Mubang and Winifred Tawa suggested that Chumbow was not forced to work in any manner different from any other child. Several Government witnesses, including Gwanaji, Ndikum, Monikang, and Elizabeth Johnson, also conceded that they had never seen injuries or any beatings. The defense heavily

emphasized that Chumbow did not seek medical treatment for her injuries and did not approach the authorities for almost five years. Nevertheless, Mubang's evidence ultimately proved unpersuasive.

### B.    Procedural Background

In a superseding indictment dated September 27, 2004, a grand jury charged Mubang with one count of holding a juvenile to a term of involuntary servitude and one count of harboring a juvenile alien for financial gain. On November 17, 2004, a jury convicted Mubang of both counts of the indictment. Sometime between the verdict and sentencing, Mubang fled the country and returned to her native Cameroon. This court then issued a bench warrant for her arrest. A few months later, on February 28, 2005, Mubang was sentenced *in absentia* to concurrent terms of 210 months of imprisonment (on count one) and 120 months of imprisonment (on count two), along with three years of supervised release. Judgment was entered on March 1, and counsel for Mubang noted an appeal to the United States Court of Appeals for the Fourth Circuit two days later.

Mubang's counsel moved to stay the appeal because Mubang was a fugitive on April 6, 2005. The Government responded in opposition and moved to dismiss the appeal on April 15. On April 20, 2005, the Fourth Circuit denied the motion to stay and

dismissed the appeal, but granted Mubang leave to move to file an appeal, with good cause shown, if Mubang surrendered herself to federal custody within 30 days. Mubang did not do so. Instead, she was apprehended in Cameroon on May 26, 2005 and returned to the United States two days later. Although counsel moved to reinstate the appeal on October 7, 2005, the court denied that motion on November 21, 2005.

Counsel for Mubang, Peter Goldman, filed a Section 2255 petition on her behalf on July 19, 2006 ("the July 19 Petition"). (ECF No. 95). That motion asserts five grounds for relief: (1) her conviction on count one was barred by the statute of limitations; (2) the Government did not timely disclose exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963); (3) she was deprived of her jury trial right because the jury delivered a verdict in "less than two hours"; (4) certain testimony from three other women who lived with Mubang was improperly admitted; and (5) the evidence was insufficient to establish coercion, a required element under count one.

Mubang then submitted a "pro se motion to amend" her Section 2555 petition, which she states she delivered to prison

authorities on July 20, 2006 ("the July 20 Amendment").[4] (ECF No. 96). The court received and docketed the motion on July 24, 2006. In the proposed amendment, she raises several new claims, including actual innocence,[5] additional *Brady* violations, ineffective assistance of counsel, and an "absence of federal jurisdiction."

The Government opposed both of Mubang's motions on September 28, 2006. (ECF No. 101). It limited its response, however, to a number of procedural issues that it believes bar Mubang's claim. Mubang then filed a reply to this "procedural objection" on November 27, 2006. (ECF No. 106).

## II. Preliminary Considerations

After Mubang filed her initial Section 2255 motion, several additional motions from her followed: a motion for clarification of the filing date of her amended motion, three motions for leave to supplement the record, a motion to submit unpublished authorities, a motion for a summary order for an evidentiary hearing, and a motion for release from custody. The Government

---

[4]     Mubang fired Goldman by a letter dated the same day.

[5]     Although Mubang seems to assume that prisoners have a right to claim actual innocence, "[w]hether such a federal right exists is an open question" which the Supreme Court has "struggled with . . . over the years." *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 129 S.Ct. 2308, 2321 (2009).

responded only to the first motion to supplement the record and the motion to submit unpublished authorities, indicating that it did not oppose. (ECF No. 109). Because these motions seek to define the record and question what procedure should be used to resolve Mubang's motion to vacate, they are appropriately decided first.

Mubang has filed three motions for leave to supplement the record with evidence that she believes buttresses certain of her claims. (ECF Nos. 107, 114, 117). The Government did not file any opposition. Rule 7(a) of the Rules Governing Section 2255 Motions allows a court to direct the parties to "expand the record by submitting additional materials relating to the motion." The rule is not designed to allow a petitioner to add additional grounds for relief; rather, "Rule 7 is akin to an evidentiary rule rather than a rule allowing a petitioner to amend her Motion." *Thrasher v. United States*, 721 F.Supp.2d 480, 484 n.10 (E.D.Va. 2010) (citing *Blackledge v. Allison*, 431 U.S. 63, 82 (1977)). Mubang's motions to supplement and the materials attached to them appropriately address matters that she raised in her principal petitions and do not seek to raise additional claims. Accordingly, her motions to supplement will be granted.

Mubang has also submitted a "motion for summary order for evidentiary hearing." (ECF No. 113). In support, she argues that an evidentiary hearing should be ordered because the Government has "defaulted" by not responding to the merits of her arguments. She reasons that the Government's opposition is a non-responsive motion to dismiss because which it raises only procedural objections. Of course, a habeas petitioner is not entitled to automatic relief even if the Government does default. *See Gordon v. Duran*, 895 F.2d 610, 612 (9th Cir. 1990) (listing cases). But even if default did justify automatic relief such as an evidentiary hearing, there was no default by the Government in this case. Rather, the Government chose merely to focus its efforts on procedural grounds. That choice is a valid strategic decision that does not merit any kind of sanction.[6]

Additionally, the court received a "motion for release." (ECF No. 118). Although not explicit, the motion appears to

---

[6] The Government should be cautious, however, in taking this approach too often. Its procedural arguments ultimately prove persuasive in this case, but had they failed, the Government's failure to address the merits of the petitioner's claim might have amounted to a waiver of all substantive defenses. *See, e.g.*, *Williams v. Birkett*, 697 F.Supp.2d 716, 722 & n.4 (E.D.Mich. 2010) (finding, where state raised only procedural defenses to certain claims, that substantive defenses to those claims were waived).

request immediate release pending the court's disposition of her Section 2255 motion. Because the court will resolve the merits of Mubang's Section 2255 below, this motion is effectively moot. Even if it were not, the motion would not support relief. To succeed on such a motion, the motion must establish a high probability of success on a substantial constitutional claim and extraordinary circumstances warranting release. *Cf. Mapp v. Reno*, 241 F.3d 221, 226 & n.5 (2$^d$ Cir. 2001) (discussing standard and listing cases in habeas context); *see also United States v. Eliely*, 276 F.App'x 270, 270 (4th Cir. 2008) (applying standard in Section 2255 context). Mubang's motion does not approach that threshold. Instead, it appears to be an altered version of a Congressional Research Service report on the Federal Sentencing Guidelines. There is no explanation as to how such information requires Mubang's release; instead, there is merely a conclusory paragraph attached to the end of the report stating she was overcharged, innocent, misled by her legal team, and afraid of the Government. These unsupported statements are not enough.

The remaining motions require only brief discussion. First, Mubang filed a letter that was docketed as a motion requesting clarification from the court on when her *pro se* amended petition was deemed filed. (ECF No. 99). Because the

court will resolve the issue herein, the motion will be denied as moot. Second, Mubang also filed a motion to submit unpublished authorities. (ECF No. 108). Leave of court is not required to submit such authorities. *See* Local Rule 105.5(a). Consequently, although the court will consider Mubang's authorities, the motion will be denied as moot. Finally, Mubang has moved to submit corrected versions of some of her earlier, *pro se* filings. (ECF No. 110). Because these filings only correct formatting errors in the prior documents, the motion to correct will be granted.

## III. Standard of Review

Title 28 U.S.C. § 2255 requires a petitioner to prove by a preponderance of the evidence that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law." If the court determines that the prisoner's sentence is unlawful on one of these specified grounds, the court may then fashion an "appropriate" remedy, including discharge, resentencing, or a new trial. *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010). But if the Section 2255 motion, along with the files and records of the case, conclusively shows that he is not entitled to relief, a hearing on the motion is

unnecessary and the claims raised in the motion may be dismissed summarily. 28 U.S.C. § 2255(b).

## IV. Analysis

The Government raises separate objections to the July 19 Petition and the July 20 Amendment. As to the July 19 Petition, the Government maintains that Mubang has procedurally defaulted all of the claims it presents because those claims could have been, but were not, presented on direct appeal. As for the July 20 Amendment, the Government contends that the filing is untimely and not subject to equitable tolling. Moreover, the Government says, to the extent any claims in the July 20 Amendment are timely, they would be procedurally defaulted as well.

### A. The July 19 Petition

The Government concedes that the July 19 Petition was timely. It notes, however, that Mubang never pursued her rights on direct appeal because she fled the country before sentencing, resulting in the dismissal of her appeal under the "fugitive disentitlement" doctrine. Under that doctrine, "a court may dismiss an appeal or writ of certiorari if the party seeking relief is a fugitive while the matter is pending." *Jaffe v. Accredited Sur. & Cas. Co., Inc.*, 294 F.3d 584, 595 (4th Cir. 2002) (quotation marks omitted). According to the Government,

13

Mubang cannot revive these forfeited claims unless she shows cause and prejudice – which she has not done.

### 1. Procedural Default

The ordinary rule is that "an error can be attacked on collateral review only if first challenged on direct review." *United States v. Harris*, 183 F.3d 313, 317 (4th Cir. 1999); *accord United States v. Sanders*, 247 F.3d 139, 144 (4th Cir. 2001). "[H]abeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Id.* (quotation marks omitted). Thus, for a petitioner to raise an argument she did not raise on appeal, she must meet a stringent cause-and-prejudice standard. *Pettiford*, 612 F.3d at 280.

Mubang, however, argues that her case is different. In particular, she argues that it is only appropriate to dismiss a fugitive's appeal where the "flight . . . bear[s] some relationship to the court's role and the ability of the case to proceed forward." (ECF No. 112, at 4 (citing *Ortega-Rodriguez v. United States*, 507 U.S. 234 (1993)). Mubang observes that the Fourth Circuit did not make written findings concerning whether that standard was met when it dismissed her appeal. Accordingly, "it is therefore not possible for this Court to assess without more, the validity or rationale of those dismissals." (*Id.* at 5). She then crafts a new test, wherein

the Government, in order to invoke procedural default, must establish that *it* will be prejudiced if Mubang's petition is heard.

There is no basis for Mubang's position in the law. First, this court is never charged with assessing the "validity" of any determination by the Fourth Circuit. A district court may not ignore the consequences of an appellate decision. The court must recognize the barrier that an appellate decision presents, whether that decision comes with a lengthy opinion or a short, summary order.

Thus, the only real question is whether a dismissal pursuant to the fugitive disentitlement doctrine somehow escapes the reach of the cause-and-prejudice standard. It does not. "[I]f a defendant's direct appeal was involuntarily dismissed under the fugitive disentitlement doctrine . . . a prisoner may proceed with those § 2255 claims that are cognizable and *that are not defaulted under the traditional rules of procedural default*." *Lynn v. United States*, 365 F.3d 1225, 1242 (11th Cir. 2004) (emphasis added); *see also United States v. Fato*, No. 94-7000, 1995 WL 404831, at *1 (4th Cir. July 10, 1995) (same). The thorough and persuasive analysis of the United States Court of Appeals for the Eleventh Circuit is worth quoting in full, as it compellingly explains why Mubang's reasoning necessarily fails:

15

First, if we refused to apply traditional
rules of procedural default and created a
special exception for fugitive-
disentitlement dismissals . . . , we
effectively would render the fugitive
disentitlement doctrine a nullity. If
traditional rules of procedural default did
not apply in this case, the fugitive
disentitlement doctrine would lose all
meaning as criminal defendants could escape,
have their direct appeals dismissed, and
then later bring a § 2255 motion as a
substitute for a direct appeal. This cannot
be and is not the law of this or any other
circuit.

. . .

Second, our conclusion that traditional
rules of procedural default should apply
. . . is consistent with the policy reasons
behind the procedural default rule. The
procedural default rule does not depend on
the circumstances under which an earlier
direct appeal was dismissed. That is, the
procedural default rule does not depend on
whether a movant never filed a direct appeal
or appealed but raised different issues.
Rather, the procedural default rule in the
context of § 2255 looks to conserve judicial
resources and protect the law's important
interest in the finality of judgments by
requiring that all available claims be
brought on direct appeal and not in a later
§ 2255 motion. By applying traditional
rules of procedural default . . ., we are
conserving judicial resources, respecting
the law's important interest in the finality
of judgments, and giving force to the
fugitive disentitlement doctrine.

*Lynn*, 365 F.3d at 1242-44 (citations and quotation marks
omitted). Procedural default holds a petitioner to the
consequences of her waiver, and a fugitive who absconds is

16

simply waiving her appeal in a different form. *See Ortega-Rodriguez*, 507 U.S. at 240 (stating that the Supreme Court has construed "a defendant's flight during the pendency of his appeal as tantamount to waiver or abandonment"). Mubang has procedurally defaulted the claims in her July 19 Petition.

## 2. Actual Innocence

Mubang nevertheless maintains that she can overcome her procedural default by establishing actual innocence. The bar of procedural default could be avoided if Mubang can "demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack." *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999). "And, in order to demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a movant must show actual innocence by clear and convincing evidence."[7] *Id.* at 493; *but see Harris*, 183 F.3d at 318 (stating

---

[7] Mubang also argues that the "structural defect" of lack of jurisdiction amounts to a miscarriage of justice. (ECF No. 112, at 7). She insists that her statute of limitations argument presents one such issue. The better rule is that jurisdictional issues are not exempt from the one-year statute of limitations. *See Barreto-Barreto v. United States*, 551 F.3d 95, 100 (1st Cir. 2008). Even assuming jurisdictional issues somehow avoid the procedural bar, the Fourth Circuit has clearly held that "[t]he statute of limitations set forth in 18 U.S.C. § 3282 is not jurisdictional." *United States v. Matzkin*, 14 F.3d 1014, 1017 (4th Cir. 1994) (quotation marks omitted).

that petitioner must establish that it is "*more likely than not* that no reasonable juror would have convicted him" (quotation marks omitted; emphasis added)).

Actual innocence is not the same as legal innocence. Instead, the petitioner must "demonstrate actual factual innocence of the offense of conviction, *i.e.*, that petitioner did not commit the crime of which he was convicted." *Mikalajunas*, 186 F.3d at 494. The exception is reserved for those extraordinary instances of "fundamentally unjust incarceration." *Schlup v. Delo*, 513 U.S. 298, 320-21 (1995). This case is not one of those instances.

### a. "Aggregate Errors" Theory

Mubang first maintains that the claims in her July 19 Petition "establish sufficient weaknesses in the entire course of the proceedings leading to my conviction such that a fundamental miscarriage of justice has occurred." (ECF No. 112, at 7). In essence, Mubang advances a rather circular argument that her procedurally defaulted arguments justify consideration of her procedurally defaulted arguments. There is no authority for such an approach. The Fourth Circuit, along with other courts, has indeed recognized that "the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a reversible single

error," at least where "such errors . . . so fatally infect the trial that they violated the trial's fundamental fairness." *United States v. Lighty*, 616 F.3d 321, 371 (4th Cir. 2010). Yet neither the Fourth Circuit nor any other court has ever suggested that a finding of such "cumulative error" is equivalent to a finding of actual, factual innocence. *See, e.g.*, *Bennett v. Warden, Ross Corr. Inst.*, No. 1:07-cv-889, 2009 WL 88831, at *10 (S.D.Ohio Jan. 12, 2009) ("Cumulative error claims are not cognizable on habeas corpus and cannot provide a basis for establishing petitioner's claim of actual innocence."). Indeed, courts have stressed that an actual innocence claim should be based on new evidence not presented at trial, rather than rehashed legal arguments. *See, e.g.*, *House v. Bell*, 547 U.S. 518, 537 (2006) ("[A] gateway claim requires new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." (quotation marks omitted)); *Schlup*, 513 U.S. at 316 ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim."). Thus, Mubang

has not established her actual innocence via her aggregate trial error theory.

### b. "New Evidence" of Actual Innocence

Second, in her July 20 Amendment, Mubang raises an additional actual innocence claim that is based on evidence not presented at trial. Although she has not attempted to invoke this argument in justifying the procedurally defaulted arguments of the July 19 Petition, it is nevertheless appropriate to consider whether the additional July 20 Amendment arguments save her earlier claims.[8]

Mubang's new evidence is evidently directed toward her conviction for involuntary servitude under 18 U.S.C. § 1584. Of relevance here, that statute authorizes criminal punishment of "[w]hoever knowingly and willfully holds to involuntary servitude . . . any other person for any term." The statute is

---

[8] The court assumes that all of Mubang's submissions amount to new evidence, although it is not clear that is in fact the case. Circuits disagree over whether "new evidence" in the actual innocence context must be "newly discovered" or merely "newly presented." *Compare Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005) ("Evidence is only new if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." (quotation marks omitted)), *and Hubbard v. Pinchak*, 378 F.3d 333, 340 (3d Cir. 2004) (same), *with Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003) ("All *Schlup* requires is that the new evidence is reliable and that it was not presented at trial."), *and Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003) (same).

"limited to cases involving the compulsion of services by the use or threatened use of physical or legal coercion." *United States v. Kozminski*, 487 U.S. 931, 948 (1988). Mubang's new evidence largely speaks to this coercion element.

Mubang cites five pieces of purportedly new evidence. She first invokes testimony by Angu from another proceeding, wherein Angu admits she lied under oath in this case about her marital status. She also seeks to undermine Angu's testimony by offering the sworn affidavit of Benedette Ntinglet that she (rather than Angu) first picked up Chumbow and Adembuh from Mubang's home when they ran away. She states that she did not see any wound like the one described by Angu. Her third piece of evidence is an affidavit from Joseph Meeting Adembuh – Chantal Adembuh's father and Chumbow's uncle – that states that he asked Mubang to take custody of Chumbow and (Chantal) Adembuh. He avers that neither his niece nor his daughter ever complained of abuse while they were in Mubang's care. Finally, she says that she will provide – but has not yet provided – (1) an affidavit from Chumbow's parents swearing that they authorized transfer of legal custody to Mubang; and (2) Cameroonian court documents demonstrating that she was the legal custodian of both Chumbow and Adembuh.

Mubang's evidence, taken together, falls well short of establishing that no reasonable juror would have convicted her. New evidence sufficient to establish actual innocence here would need to be powerfully persuasive, as substantial evidence was presented at trial on the issue of coercion. Chumbow herself talked extensively about her treatment while she was in Mubang's home, detailing several instances of physical violence and punishment. She talked at length about the physical brutality she suffered – beatings, whippings, and being forced to stand up throughout the night - and the fear she felt in the home. She testified that violence from Mubang was an ordinary, indeed weekly, reaction to any work Mubang perceived as inadequate. Her account of this physical violence was buttressed both by Massa and Adembuh, who personally witnessed particular beatings that Chumbow suffered at the hands of Mubang with shoes, brooms, and cables. *See United States v. Alzanki*, 54 F.3d 994, 1004 (1st Cir. 1995) (finding only two instances of physical violence, combined with poor working conditions and malnutrition, established element of coercion); *United States v. King*, 840 F.2d 1276, 1280 (6th Cir. 1988) (holding record established coercion where "defendants repeatedly used and threatened to use physical force to make the children perform labor and . . . the

22

children believed they had no viable alternative but to perform such labor").

The evidence is clear that, because of Mubang's continuing violence, Chumbow subjectively feared Mubang. That fear had an obvious basis in fact: witnesses testified to Mubang's temper and violence and her abbreviated tolerance for Chumbow's behavior. *See United States v. Djoumessi*, 538 F.3d 547, 551 (6th Cir. 2008) (finding coercion where victim possessed well-founded fears of beatings for failure to work); *cf. United States v. Booker*, 655 F.2d 562, 566 (4th Cir. 1981) (finding evidence supported slavery charge where captor created a "climate of fear"). As a child in a strange land, Chumbow was especially vulnerable to this type of conduct. *See Kozminski*, 487 U.S. at 948 (finding that a victim's "age or special vulnerability" is relevant in determining whether there was sufficient coercion); *see also Djoumessi*, 538 F.3d at 552 (noting special vulnerability of young, illegal and poor Cameroonian girl). The evidence established that Chumbow was in a uniquely compelling position of helplessness and dependency that Mubang took advantage of her for her own gain.

Moreover, several witnesses testified that Chumbow was forced to work long hours in difficult conditions. *See United States v. Farrell*, 563 F.3d 364, 373 (8th Cir. 2009) (noting

23

workers' "rigorous schedule [that] precluded sleep" in listing factors establishing coercion); *United States v. Veerapol*, 312 F.3d 1128, 1130 (9th Cir. 2002) (citing "excessive working hours" as evidence of coercion). Sleep was in short supply and work was a constant obligation. When she did find time to rest, she slept on the floor or, on one occasion, simply fell asleep in the bathtub. Testimony suggested that she sometimes lacked basic necessities – she ate furtively, and several witnesses (including Barbara Garland, Elizabeth Johnson, and Emelda Angu) commented on the "shabby" or inadequate clothing she was forced to wear. Evidence of extremely poor working conditions such as these also supports a finding of coercion. *Kozminski*, 487 U.S. at 953.

The evidence also established that Chumbow's time in the Mubang household was marked by social isolation and sadness. Chumbow was rarely allowed to leave the home. She did not have friends or attend school. According to Barbara Garland, she was rarely seen by the neighbors. She was beaten when she spoke with two family members who came to the house for a visit. She did not often receive the opportunity to speak with her family in Cameroon. In short, she was alone. *See Farrell*, 563 F.3d at 374 (referring to social isolation as evidence of coercion); *Veerapol*, 312 F.3d at 1130 (same); *Manliguez v. Joseph*, 226

24

F.Supp.2d 377, 384-85 (E.D.N.Y. 2002) (finding same in civil Section 1584 action).

The new evidence Mubang offers does little to rebut the weighty case against her. The first two pieces of evidence essentially attack the same witnesses' testimony, Emelda Angu. Mubang insists that Angu's testimony was critical to the Government's case (*see, e.g.*, ECF No. 114, at 2), but she overstates the importance of Angu's testimony at trial. Even without Angu's corroboration, the personal accounts from Chumbow, Adembuh, and Massa provided more enough evidence to find the element of coercion met. Thus, even if one were to disregard Angu's testimony in light of Mubang's "new evidence," Mubang's claim of actual innocence would still fail.

But in truth, it cannot really be said that Mubang's new evidence wholly changes Angu's testimony in any significant way. The first piece of evidence – Angu's admission that she lied about her marital status – is nothing more than impeachment evidence on a matter collateral to the merits. "This sort of latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness]'s account." *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992); *see also Calderon v. Thompson*, 523 U.S. 538, 563

(1998) (stating that impeachment evidence, which "is a step removed from evidence pertaining to the crime itself," "provides no basis for finding a miscarriage of justice"). Angu's later admission of untruthfulness did *not* suggest that *everything* she said in this trial was untruthful. To the extent Mubang is suggesting the admission generally undermines Angu's credibility, she already had ample evidence with which to attack Angu's truthfulness at trial. As Mubang admits, her counsel extensively cross-examined Angu on several false prior statements. Mubang's additional false statement is simply a cumulative addition to that evidence.

The second piece of "new" evidence – testimony from Bernadette Ntinglet that she in fact picked up Chumbow and Adembuh from Mubang's home – attacks the testimony given by Angu more directly. Yet even this testimony would not establish actual innocence. For one, as already explained, the other evidence in the record could easily permit a reasonable juror to find coercion, even putting aside Angu's somewhat cumulative corroboration of Chumbow's injuries. Even if Angu's testimony about Chumbow's head wound was entirely fiction, the record was nevertheless filled with other testimony recounting incident after incident of coercive violence. Moreover, Ntinglet's contrary testimony would have merely set up conflicting sworn

accounts for the jury. "The existence of such a 'swearing match' would not establish that no reasonable juror could have credited the testimony of the prosecution witnesses." *Moore-El v. Luebbers*, 446 F.3d 890, 903 (8th Cir. 2006); *cf. Bosley v. Cain*, 409 F.3d 657, 665 (5th Cir. 2005) (finding evidence in equipoise did not establish actual innocence).[9] In short, a reasonable juror would be justified in rejecting Ntinglet's testimony.[10]

The final three pieces of "new evidence" largely go to Mubang's assertion that there was no legal coercion.[11] Because the record firmly establishes physical coercion, legal coercion is unnecessary to support Mubang's conviction. In any event, this new evidence advances a theory wholly devoid of merit:

---

[9] Ntinglet's speculative assertion that Angu lied because she was jealous of Mubang's wealth does not even merit comment. "[S]peculative and collateral impeachment falls far short of showing grounds for actual innocence." *Gandarela v. Johnson*, 286 F.3d 1080, 1086 (9th Cir. 2002).

[10] This is particularly so when, like Angu, there are reasons to question Ntinglet's credibility. In an earlier affidavit, for instance, Ntinglet stated that Angu "took pictures of Evelyn's scars." Later, however, Ntinglet insists that "if Ms. Chumbow had any type of physical injury or scarring then, I would have seen it."

[11] Joseph Meeting Adembuh does state that he did not hear any complaints of physical abuse, but it is unsurprising that a relative in Cameroon would not be privy to happenings in Mubang's home several thousand miles away.

that Mubang's actions were somehow justified because Chumbow's relatives (as well as the Cameroonian legal authorities) placed Chumbow in her care. The Sixth Circuit has convincingly rejected this type of argument before, in a case with facts similar to this one:

> Djoumessi next points out that Fru's parents placed her in his care under a Cameroonian tradition known as "take my child," by which a poor family entrusts its child to a wealthier one who pledges to care for the child as its own. Once that tradition is accounted for, Djoumessi argues, it is clear either that Fru became his adopted daughter as a matter of law or that he at a minimum had the consent of Fru's parents, both of which would permit him to require her to perform chores around the house. In one sense, Djoumessi is right. Section 1584 does not restrict parents' (or guardians') rights to require their children (or wards) to help with household chores. But . . . even if Djoumessi had the consent of Fru's parents to treat her the way he did (something the record also does not support), that would not do the trick. When parents explicitly renounce their parental relationship – by selling a child into slavery or abandoning her to involuntary servitude – parental consent cannot provide a subsequent defense for the third party. A parental consent defense is particularly inappropriate on the facts of this case because Fru's parents abdicated any semblance of parental supervision and control.

*Djoumessi*, 538 F.3d at 553 (citations, quotation marks, and brackets omitted).

In sum, Mubang "substituted for a promised education and compensation a regime of psychological cruelty and physical coercion that took some of the best years of a young girl's life. For that, involuntary servitude is not too strong a term." *United States v. Odeozor*, 515 F.3d 260, 272 (4th Cir. 2008). She is not actually innocent. Her procedurally defaulted claims will not be considered.

**B.    The July 20 Amendment**

**1.    Timeliness**

Mubang attempted to amend her petition on July 20, 2005,[12] but the Government protests that the amendment is untimely under the applicable statute of limitations. The Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a one-year statute of limitations on Section 2255 petitions brought by federal prisoners. To be timely, a federal prisoner must file any motion to vacate, set aside, or correct his sentence within one year of the latest of the following dates:

> (1) the date on which the judgment of conviction becomes final;

---

[12]    Although the court did not docket Mubang's motion until July 24, 2005, Mubang states that she provided her motion to prison authorities on July 20. The Government concedes for purposes of this argument that the "prison mailbox rule" applies and that the court should treat July 20, 2005 as the relevant filing date. *Houston v. Lack*, 487 U.S. 266, 272-73 (1988).

> (2) the date on which the impediment to making a motion created by Governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such Governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f). Here, the Government insists that the statute of limitations expired on July 19, 2005, one day before Mubang's filing. The Government is correct.

Mubang maintains that the relevant statute of limitations expired, at the earliest, on July 20, 2005. She agrees that the one-year statute of limitations can be triggered on "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). She also recognizes that, in this context, "[f]inality attaches when [the Supreme] Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003); *accord United States v. Sosa*, 364 F.3d 507, 509 (4th Cir. 2004).

She errs, however, in somehow concluding that the time for filing a Section 2255 is one year and one day from the date "finality" attaches. "When a statute of limitations is measured in years, the last day for instituting the action is the anniversary date of the start of the limitations period."[13] *Hernandez v. Caldwell*, 225 F.3d 435, 439 (4th Cir. 2000) (quoting *Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir. 1998)); *see also, e.g.*, *Ramos-Martinez v. United States*, 638 F.3d 315, 320-21 (1st Cir. 2011) (finding, where direct appeal was decided on October 12, 2005 and conviction became final on January 10, 2006, that time for filing Section 2255 petition ended on January 10, 2007); *Stroman v. Thaler*, 603 F.3d 299, 301 (5th Cir. 2010) (finding, absent tolling event, that where petitioner's time for filing petition for certiorari expired on August 20, 2002, the one-year habeas statute of limitations expired on August 20, 2003). The Fourth Circuit dismissed Mubang's appeal on April 20, 2005. She then had 90 days, until July 19, 2005, to file a petition for writ of certiorari. Supreme Court Rule 13.1. Because she did not, the one-year limitations period began running the next day

---

[13]    *Hernandez* calculated when the statute of limitations expired when the triggering date was the enactment of AEDPA. Because AEDPA was enacted on April 24, 1996, the statute of limitations expired on April 24, 1997. *Hernandez*, 225 F.3d at 439. Mubang incorrectly cites this rule in her favor of her "one year and one day" rule.

and expired on July 19, 2006. Her petition, therefore, was one day late. *See, e.g.*, *Munnerlyn v. United States*, No. 2:08-cv-229, 2009 WL 1362387, at *2 (S.D.Ohio May 13, 2009) (petition was untimely where 90-day period to file petition for writ of certiorari expired on January 23, 2007 and prisoner provided petition to prison authorities on January 24, 2008); *Green v. Brown*, No. 06 Civ. 6962, 2007 WL 4882657, at *4 (S.D.N.Y. 2007) (petition was untimely where 90-day period to file petition for writ of certiorari expired on August 4, 2005 and prisoner provided petition to prison authorities on August 5, 2006).[14]

Mubang nevertheless maintains that her conviction did not become final on July 19, 2005, as the Fourth Circuit dismissed her appeal with leave to file a motion to reinstate her appeal within 30 days. She also notes that the Fourth Circuit "entertain[ed]" her later motion to reinstate her appeal and ultimately denied it in November 2005. Thus, she argues that the time for filing a petition for writ of certiorari did not

---

[14]    Mubang relies heavily on *Clay v. United States*, 537 U.S. 522 (2003), to support her argument that the period for filing a petition for certiorari expires on the 91st day (rather than the 90th day) after a direct appeal is decided. In *Clay*, the United States Court of Appeals for the Seventh Circuit affirmed the petitioner's convictions on November 23, 1998. The time for filing a petition for writ of certiorari expired on February 22, 1999 – 91 days later. This one-day extension, however, resulted from the fact that February 21, 1999 was a Sunday. *See* Fed.R.Civ.P. 6(a)(1)(C).

begin running until either May 20, 2005 (30 days from the Fourth
Circuit's order dismissing her appeal) or November 21, 2005 (the
day the Fourth Circuit denied her motion to reinstate).

The Fourth Circuit's decision to allow Mubang to move to
reinstate within 30 days did not toll the period for filing a
petition for writ of certiorari. Supreme Court Rule 13.1
provides that "a petition for writ of certiorari to review a
judgment in any case, civil or criminal, entered by . . . a
United States court of appeals . . . is timely when filed with
the Clerk of this Court within 90 days after entry of the
judgment." In the civil context, the Court has held that this
90-day period begins to run only when the court of appeals
enters a "genuinely final judgment." *Limtiaco v. Camacho*, 549
U.S. 483, 487 (2007). Even if one assumes that a similarly
strict finality requirement applies in the criminal sphere,
there is every indication that the Fourth Circuit intended its
decision to be final as of April 20, 2005. The plain language
of the Fourth Circuit's order and judgment is the clearest and
most important clue. The court's order, for instance, did not
state that Mubang's appeal *would* be dismissed in 30 days if she
failed to surrender herself; rather, it indicated that the
appeal *was* dismissed as of April 20. The attached judgment
speaks in even more unequivocal terms, stating that "the Court

33

dismisses the appeal." The mandate issued on May 17, 2005, in accordance with Federal Rule of Appellate Procedure 41(b), rather than being held until after the expiration of the 30-day "leave" period. In short, all signs indicate the Fourth Circuit had no wish to proceed further with Mubang's case. When a judgment – no matter what the form – indicates that a court is "utterly finished" with its work, the judgment is final. *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 176 (4th Cir. 2007).[15]

It also is irrelevant for the purposes of assessing timeliness that the Fourth Circuit considered and denied an untimely motion to reinstate her appeal that Mubang filed in October 2005. Mubang suggests that the Fourth Circuit's consideration of her motion is equivalent to a circuit court's decision to entertain an untimely petition for rehearing. To be sure, the Supreme Court has held that "a court's appropriate decision to entertain an untimely rehearing petition" tolls the time for filing a petition for writ of certiorari because that decision "raise[s] the question whether the court will modify the judgment." *Hibbs v. Winn*, 542 U.S. 88, 98 (2004); *see also*

_____

[15]    Additionally, were the court to adopt Mubang's argument, fugitives would effectively be rewarded for absconding.

Supreme Court Rule 13.3.  The Supreme Court has never held, however, that a motion to reinstate has the same effect – and for good reason.  To allow untimely motions such as these to would render AEDPA's one-year statute of limitations a nullity.  Indeed, although few courts have addressed the issue directly, those that have have rejected similar attempts to extend the certiorari filing period with this kind of out-of-time motion.  *See Benavides v. United States*, No. 9:09cv104, 2010 WL 998980, at *3 (E.D.Tex. Jan. 19, 2010); *Pena v. United States*, No. 05-137-T, 2009 WL 196110, at *2 (D.R.I. Jan. 23, 2009); *United States v. Black*, No. 3:04-cv-547-MEF, 2006 WL 2547339, at *3 (M.D.Ala. Aug. 31, 2006).  As one of those courts said:

> Taken to its logical conclusion, [the petitioner]'s argument that his conviction became final for purposes of § 2255 only upon the conclusion of his fruitless litigation of his motions for out-of-time appeal would allow any defendant who fails to appeal or collaterally attack his sentence in a timely fashion to extend § 2255's period of limitation endlessly, merely by filing meritless out-of-time appeal motions and then appealing the district court's rulings denying such motions – even where (as in [the petitioner]'s case) the appellate court ultimately determines that no basis in law exists for an out-of-time appeal.  If [the petitioner] were to prevail on this argument, he would have successfully extended the limitation period for more than 44 months from the district court's original judgment, which he failed to appeal in a timely manner.

35

*Black*, 2006 WL 2547339, at *3; *cf. Adeline v. Stinson*, 206 F.3d 249, 252-53 (2[d] Cir. 2000) ("Were the law otherwise, then so long as the . . . court were willing to keep its clerk's office door open to a petitioner, he or she could bring successive motions seeking to reinstate a denied petition for leave to appeal indefinitely and thus stave off the running of the AEDPA-proscribed time to file a federal petition for habeas corpus virtually in perpetuity.").[16]

## 2. Equitable Tolling

Even though her motion is untimely, Mubang insists that she deserves one day of equitable tolling. Because AEDPA's

---

[16] In a footnote argument, Mubang maintains that her actual innocence and *Brady* claims are also timely under 28 U.S.C. § 2255(f)(4), as she only discovered the facts underlying those claims when she absconded to Cameroon before sentencing. Section 2255(f)(4) provides that the one-year limitations period runs "from the date on which the facts supporting the claim or claims could have been discovered through the exercise of due diligence." Mubang does not explain why her "newly discovered facts" were unavailable at the time of trial (or some other time before her trip to Cameroon) or what reasonable diligence she exercised in learning of them. *See Aron v. United States*, 291 F.3d 708, 711 (11th Cir. 2002) (explaining that because the statute refers to when facts could have been discovered, as opposed to when they were actually discovered, "the beginning of the one-year period is triggered by a date that is not necessarily related to a petitioner's actual efforts or actual discovery of the relevant facts"). Yet even if one were to assume Mubang's claims were timely under 2255(f)(4), they would still fail because Mubang has not overcome her procedural default of her *Brady* claims and has not met the standard for establishing actual innocence.

"limitations provisions . . . do not speak in jurisdictional terms or refer in any way to the jurisdiction of district courts[,] . . . § 2255's limitation period is subject to equitable modifications such as tolling." *United States v. Prescott*, 221 F.3d 686, 688 (4th Cir. 2000) (quotation marks omitted). The Fourth Circuit has emphasized that the doctrine is to be applied in only limited circumstances. *See Sosa*, 364 F.3d at 512 (explaining that equitable tolling is only available in "rare instances"); *Prescott*, 221 F.3d at 688 (characterizing equitable tolling as an "extraordinary remedy" that is only "sparingly granted"); *see also Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc) (stating, in Section 2254 context, that "rarely will circumstances warrant equitable tolling"). To justify invoking this exceptional relief, Mubang must demonstrate "(1) extraordinary circumstances, (2) beyond his control or external to his own conduct, (3) that prevented him from filing on time." *Sosa*, 364 F.3d at 512 (quotation marks omitted). Mubang must also demonstrate that she pursued her rights diligently. *Green v. Johnson*, 515 F.3d 290, 304 (4th Cir. 2008).

Although Mubang invokes the "spirit of equitable tolling" to toll "only 24 hours" (ECF No. 112, at 22), the length of time tolled is not an appropriate consideration. Courts "look not to

37

the length of the delay, but to the reasons for delay in determining whether equitable tolling is appropriate." *Rouse*, 339 F.3d at 253. In *Rouse*, for instance, the Fourth Circuit denied equitable tolling to a state capital habeas petitioner who filed his petition one day late due to his counsel's miscalculation of the limitations period.

In addition, Mubang briefly invokes her actual innocence argument again in support of equitable tolling. It is not obvious that innocence even justifies tolling; the circuits are split on the issue, and neither the Fourth Circuit nor the Supreme Court has ever addressed the question directly. In any event, the question of whether innocence may be used to avoid AEDPA's time bar need not be resolved here because, as discussed above, Mubang has not put forth a credible claim of actual innocence.

The heart of Mubang's argument for equitable tolling, however, rests on her post-conviction counsel's conduct. In particular, she states that she repeatedly sought documents related to her case from Goldman (who was also her trial and appellate counsel), but he failed to respond. As a result, she maintains that she "was ill-prepared to develop the claims presented in [her] July 20th Amendment" (ECF No. 112, at 21),

even though she did eventually receive the files at some unspecified time.

Relying on the Fourth Circuit's decision in *Rouse v. Lee*, 339 F.3d 238, 250 (4th Cir. 2003), the Government asserts that the type of attorney error Mubang alleges does not amount to an "extraordinary circumstance." In *Rouse*, the Fourth Circuit reaffirmed the notion that attorney error generally does not amount to an extraordinary circumstances justifying equitable tolling. *Id.* at 248-49. The court further noted that the errors of a petitioner's counsel are attributable to the petitioner; consequently, they are not "external." *Id.* at 249-50. The court reasoned that counsel's errors would not be attributable to a client if they amounted to ineffective assistance, but there can be no constitutionally ineffective assistance in the habeas context because there is no constitutional right to counsel in those proceedings. *Id.*

On its face, *Rouse* would seem to prevent Mubang from invoking her attorney's non-responsiveness as an exceptional circumstance. But after the Government submitted its opposition in this case, the Supreme Court issued its decision in *Holland v. Florida*, 130 S.Ct. 2549 (2010). That decision significantly

undercuts the force of *Rouse*.[17]   In *Holland*, the Supreme Court
reaffirmed that equitable tolling applies to AEDPA's one-year
statute of limitations, and further concluded that attorney
misconduct that amounts to more than a "garden variety claim" of
attorney negligence can constitute a circumstance justifying
equitable tolling.   *Id.* at 2562-64.   In particular, such
circumstances might arise when an attorney effectively abandons
his client.  *Id.* at 2564.

Yet the alleged behavior of counsel in this case does not
rise to the level of attorney misconduct deemed sufficient in
*Holland* to trigger equitable tolling.   In *Holland*, post-
conviction counsel ignored several letters from his client
begging him to file a habeas petition.   *Id*.  He then failed to
file a timely petition and failed to inform his client of an
important state court decision, despite many "pleas for that
information."  *Id.*  Even on those egregious facts, the Court was
unwilling to state in absolute form that the attorney misconduct

---

17      *Holland* addressed a state prisoner's claim for federal
habeas relief under Section 2254.   The decision's reasoning,
however, applies with equal force in the Section 2255 context,
and the Fourth Circuit has since applied it to Section 2255
claims.  *See, e.g.*, *United States v. Terrell*, No. 10-6886, 2010
WL 5376290, at *1 (4th Cir. Dec. 21, 2010); *United States v.
Oriakhi*, No. 08-8224, 394 F.App'x 976, 977-78 (4th Cir. 2010).

amounted to extraordinary circumstances – the Court only concluded that the facts *suggested* such circumstances. *Id.*

The *Holland* decision cited with apparent favor several lower court decisions also finding extraordinary circumstances resulting from attorney neglect. Although some of these cases involved a degree of non-responsiveness or a failure to turn over files, each case also included other misbehavior not seen here. *See, e.g.*, *United States v. Martin*, 408 F.3d 1089, 1096 (8th Cir. 2005) (allowing equitable tolling where attorney made misleading statements to petitioner and retained files); *Spitsyn v. Moore*, 345 F.3d 796, 801 (9th Cir. 2003) (finding extraordinary circumstances where counsel was entirely non-responsive, detained file for the duration of the limitations period, and filed no petition); *Nara v. Frank*, 264 F.3d 310, 320 (3rd Cir. 2001) (finding evidentiary hearing appropriate where attorney "effectively abandoned" petitioner). This case, on the other hand, presents only the singular failure to provide certain requested files.

If anything, this case would present an instance of attorney negligence that would not fall into the category of gross misconduct described in the preceding cases. *Accord Stewart v. Sec'y, Fla. Dep't of Corr.*, 355 F.App'x 275, 281-82 (11th Cir. 2009) ("At the most, [counsel]'s failure to return the

record in a timely fashion may be considered negligent. This mere negligence is not the type of attorney misconduct that will trigger equitable tolling."). Yet even negligence is likely too strong a label for counsel's conduct in this case. Fundamentally, Mubang's complaint would seem to be that her counsel did not include her enough in the development of the Section 2255 petition. But except on certain limited matters not implicated here, there is no requirement that counsel consult the client in making arguments and filing motions with the court. *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010); *see also Florida v. Nixon*, 543 U.S. 175, 187 (2004); *New York v. Hill*, 528 U.S. 110, 114-15 (2000). Mubang might have wished that she had been permitted to review legal documents and craft legal arguments on her own. But in the end, she retained her lawyer to file a petition – and he filed it. That was not misconduct constituting an exceptional circumstance. Equitable tolling is not warranted.

### 3. Relation Back

Some of the arguments Mubang makes might still be considered on their merits if they relate back to the timely petition filed by counsel. Because the Rules Governing Section 2255 Proceedings do not specifically address the procedure for amending Section 2255 motions, "courts have typically applied

Federal Rule of Civil Procedure 15 to the amendment of a § 2255 motion." *United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000). In some circumstances, Rule 15(c) will allow an amendment that is otherwise barred by the statute of limitations to relate back to the claims contained in the original filing. "Relation back is permitted when the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading." *Id.* (quotation marks omitted). Importantly, "[t]he fact that amended claims arise from the same trial and sentencing proceeding as the original motion does not mean that the amended claims relate back for purposes of Rule 15(c)." *Id.* at 318; *accord Mayle v. Felix*, 545 U.S. 644, 664 (2005).

Mubang argues that three types of claims in her amended motion relate back to her earlier filing: her *Brady* claims, her actual innocence claims, and her claims related to the court's lack of jurisdiction.[18] Ultimately, none of these claims succeed.

_____

[18] Mubang does not argue that her ineffective assistance of counsel claims relate back to the earlier filing. Such an argument would likely fail. Relation back is appropriate "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts." *Mayle*, 545 U.S. at 664. The ineffective assistance of counsel claims in the amended petition center upon the actions and choices of trial counsel; those actions were not implicated by any of the claims

Mubang first notes that she filed a *Brady* claim in her timely motion (presented by counsel), such that her amended motion merely "modified" that claim to allege certain additional disclosures that the Government failed to make. As a threshold matter, several courts have indicated that new claims do not relate back "simply because they violate the same constitutional provision." *United States v. Gonzalez*, 592 F.3d 675, 680 (5th Cir. 2009). Thus, Mubang cannot simply assume that a late-filed *Brady* claim relates back to an earlier-filed *Brady* claim. But most importantly, even if the amended claims are of the same "time and type" as those presented in the original petition, *Mayle*, 545 U.S. at 650, they are procedurally barred for the reasons already stated above. The same is true of Mubang's claims premised on a lack of jurisdiction: lacking any cause for her procedural default, she cannot bring them in an amended petition.

As for her actual innocence claim, Mubang attempts to tie the claim back to her initial argument that the evidence was insufficient to establish coercion. But "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Thus, the claims

_____

raised in the original petition. It follows then that they do not share a common core.

are readily distinguishable. Even if they were not and the innocence claim did relate back, it would nevertheless fall. As explained above, Mubang has failed to establish any actual innocence claim sufficient to support cause for her procedural default. "[I]f free-standing actual innocence claims were cognizable on federal habeas review, the threshold showing for such an assumed right would necessarily be extraordinarily high." *Buckner v. Polk*, 453 F.3d 195, 199 (4th Cir. 2006) (quotation marks omitted). A petitioner cannot meet that standard when she "has failed to meet even the presumptively less stringent standard of proof by which gateway innocence claims are measured." *Id.*

## V. Conclusion

For the foregoing, Mubang's three motions to supplement the record will be granted, her motion to submit unpublished authorities will be granted, and her motion to submit corrected filings will be granted. All other pending motions, including the motion for relief under Section 2255, will be denied.

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts, the court is also required to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability is a "jurisdictional prerequisite"

45

to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007). Such a certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a motion is denied on a procedural ground, a certificate of appealability will not issue unless the petitioner can demonstrate both "(1) that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Rose v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001) (quotation marks omitted). Upon its review of the record, the court finds that Mubang does not satisfy the above standard.

A separate order will follow.

_____
                    /s/
DEBORAH K. CHASANOW
United States District Judge